UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| ALBERTO HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 15-151-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| WILLIAM GOINS, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

Plaintiff Alberto Harris seeks damages under 42 U.S.C. § 1983 and state law theories, including for alleged malicious prosecution, violations of his due process and Sixth Amendment rights, conspiracy, and intentional infliction of emotional distress. The police officers responsible for initiating his 2010 arrest and prosecution (for distribution of a controlled substance within 1,000 yards of a school zone), their respective employers, and Clay County, Kentucky, are named as defendants. Separate motions for summary judgment filed by Defendant Clay County and Defendant Goins, et al., are pending for consideration. [Record Nos. 82 and 83] Former confidential informant Christina Little, her husband Lonnie Philpot, "Unnamed Law Enforcement Officers" and "Unnamed Supervisors of Individual Defendants" are also named as defendants, but are not parties to the present Rule 56 motions. [*See* Record No. 1.] The record reflects that Little and Philpot were served with the Complaint [Record Nos. 10 and 15] but have not filed answers or otherwise appeared.

-1-

Summary judgment in not appropriate on the malicious prosecution and related claims because there is a genuine issue of material fact regarding probable cause to arrest Harris. However, because the named defendants are not proper targets of liability for Harris's alleged Sixth Amendment violation, summary judgment will be granted on that theory. Accordingly, Defendant Clay County's motion will be granted in full, and Defendant Goins's motion will be granted in part.

## I.

On September 16, 2010, Plaintiff Alberto Harris was arrested for distribution of a controlled substance within 1,000 yards of a school in violation of KRS 218A.1411. [Record No. 1 at 5-7] The arrest was pursuant to an arrest warrant obtained by officers in conjunction with a search warrant for Harris's residence. [*Id.*] Harris spent two periods in pre-trial detention, interspersed by two periods of bond. [*See* Record No. 83-8.] Nearly four years later, on September 10, 2014, the charges against him were dismissed when the government's witnesses failed to appear on the morning of trial. [*Id.*; Record No. 1 at 12] Harris filed the present suit for damages, alleging that his arrest and lengthy pre-trial detention were the result of a conspiracy between law enforcement and others. [*See* Record No. 1.]

His Complaint contains ten counts. Harris alleges malicious prosecution under 42 U.S.C. § 1983 and state law, violations of substantive and procedural due process, failure to intervene, violations of his Sixth Amendment right to a speedy trial, supervisory liability, conspiracy to violate his constitutional rights, unconstitutional policies/customs/ practices/failure to act, intentional/reckless infliction of emotional distress, negligent infliction

of emotional distress, civil conspiracy under Kentucky law, and negligence/gross negligence/recklessness. [*Id.*][1]

In a 2001 civil action, Harris obtained a monetary judgment against Defendant Robinson. [Record No. 1 at 5]  Under Harris's theory, Robinson intended to get even and, in 2010, had his chance.  According to Harris, Robinson enlisted the assistance of Defendants Goins, Little and Philpot to frame Harris for selling drugs.  [*See* Record No. 1.]

In 2001, Defendant Robinson was a City of Manchester Police Officer, and later became a detective.  By 2010, he was employed by Defendant Unlawful Narcotics Investigation Treatment and Education, Inc. ("UNITE") as a narcotics detective.  Defendant Goins was a patrol officer with the City of Manchester Police in 2010.  Harris alleges that Robinson and Goins obtained the assistance of "known criminal[s]" Little and Philpot to fabricate evidence, obtain Harris's arrest, and keep him incarcerated.  Harris contends that Little had a warrant for her arrest in Ohio, and that she and Philpot were inherently untrustworthy as informants.  [*See* Record No. 102.]  He also asserts that Philpot and Little had motive to frame him because Philpot previously had been arrested by Goins for selling drugs and was promised that, if he and/or Little worked as informants, there was a chance that his charges would be reduced.  Finally, Harris alleges that Goins lied during the preliminary hearing and, at the very least, recklessly omitted facts during his grand jury testimony to

---

[1]    On December 28, 2015, Defendant Unlawful Narcotics Investigation Treatment and Education, Inc.'s (UNITE) Motion to Dismiss was granted in part.  [Record No. 20]  On January 11, 2017, by Agreed Order, Defendant Kevin Johnson was dismissed as a defendant. [Record Nos. 140 and 141]  Finally, in his Consolidated Response, the plaintiff concedes a lack of evidence demonstrating Defendant George Stewart's participation in the alleged wrongdoing.  [Record No. 102 at n.1]  Accordingly, the claims against Defendant Stewart will be dismissed.

continue Harris's prosecution despite a lack of probable cause. Harris also claims that Goins fabricated evidence. However, Harris does not suggests Goins's motive for participating in this conspiracy.

The defendants argue in response that Robinson's alleged motive for a nearly decade-old civil suit is unfounded, especially because there is no evidence that Robinson was ever disciplined or otherwise suffered adverse consequences following the 2001 suit. [*See* Record No. 83; Record No. 106.] Moreover, they assert that numerous citizens had complained about Harris selling drugs out of his residence, which was unremarkable given Harris's past (*i.e.*, he was on parole for a drug conviction). [*Id.*] In light of those complaints, the defendants assert that they conducted a valid, controlled purchase using Little who was a proven-reliable confidential informant, and that there was ample probable cause to arrest him and seek to continue his prosecution. [*Id.*]

The following facts are clearly ascertainable from the record. [*See e.g.,* Record No. 83-17 ("Buy Video").] On September 16, 2010, Goins and Robinson outfitted Little with a key-fob style audio/video recording devices and provided her with two ten dollar bills, with the understanding that she would attempt to purchase one pill of Xanax from Harris.[2] [Record No.

---

[2]    It is undisputed that Little had worked previously as a confidential informant for the defendant-officers and/or the City of Manchester Police Department, including as recent as that morning conducting a separate controlled buy. [Record No. 83-1 at 5; Record No. Little's husband, Lonnie Philpot, who was present and acting as Little's driver that day, had previously himself been the target of a controlled buy, and had outstanding charges against him. [*See* Record No. 102 at 5.] It is also undisputed that Little hoped that, in exchange for her cooperation, the officers would recommend reduced charges against Philpot for his assistance. [*Id.* at 11]

Next, it is undisputed that the officers asked Little if she would be able to buy drugs from Harris. [Record No. 102 at 5] Little was an acquaintance of Harris, who happened to be a relative of Little's husband, Lonnie Philpot. Philpot is the son of Harris's first cousin.

83-1 at 5-6]  Acting as a confidential informant, Little traveled to plaintiff's residence in a vehicle driven by Philpot.  [Record No. 102 at 7]  Little returned a short time later to the officers location in the parking lot of Eastern Kentucky University's Manchester Campus building.  Little returned with eight dollars in change and one pill which she claimed was Xanax.[3]  She informed the officers that Harris sold her the pill from inside his residence.  The officers proceeded to call poison control to confirmed that the pill was Xanax.

Goins prepared and submitted an affidavit for a warrant to search Harris's residence based on the drug evidence and Little's statement.  [Record No. 83-18 at 20-22]  The affidavit attests the CI's statement that Harris had called the CI several times on that date and stated that he had Xanax tablets at his residence for sale.  [*Id.*]  The affidavit attests that the CI was outfitted with an audio/video recording device, but does not specify the substance of the video

---

[Record No. 83-1 at 5]  According to officers, at first, Little denied that she could purchase drugs from Harris, stating that he was interested in exchanging pills for sex (a point that would later be essentially corroborated by Harris's own statement).  [*Id.* at 5-6]  However, according to the officers, on the morning of September 16, 2010, Little told officers that Harris called her saying that he had pills she could purchase.  Harris disputes this latter point.  Although based only on his speculation, Harris contends that the officers conspired with Little to plant drugs at his home.  [*See* Record No. 1 at 5.]  However, Harris later admits that he did, in fact, possess Xanax pills, although he suggests that he had a valid prescription.  [*See* Record No. 83-1 at 6 (citing Harris deposition).]

[3]    There is conflicting testimony regarding whether the officers followed Little and Philpot.  Robinson appeared to recall driving by the residence.  [Record No. 85 at 31 (Robinson depo. at 119)]  However, Goins stated during his preliminary hearing testimony that they did not follow the confidential informant [Record No. 83-7 at 6], and could not recall driving by the house [Record No. 84 at 25 (Goins depo. at 96)].  Taking the evidence in the light most favorable to the non-moving party, the Court credits Goins testimony that they did not follow the confidential informant.  Therefore, apart from the video evidence, the officers had no basis to corroborate that Little's assertion that she entered Harris's residence during her departure from and return to the officer's location.

recording.[4]  [*Id.*]  It explains that the CI was given two ten-dollar bills, and identifies the serial

numbers.  It states that the CI left the meeting location and returned a short time later with a

white oblong tablet which she stated was Xanax that she had just purchased from Harris for

$12.00 at his Pennington Hill residence.  [*Id.*]  The affidavit attests that poison control was

called and indicated that the table was generic Xanax, a Schedule 4 controlled substance.  [*Id.*]

The affidavit attests that the CI stated she entered Harris's residence and he went into the back

bedroom and returned with the pill.  [*Id.*]

Harris provided the CI with $8.00 in change for the $20.00 in marked bills.  [*Id.*]  The

CI then returned the $8.00 to the officers.  [*Id.*]  Finally, the affidavit attested to the following

independent investigation conducted by the officers:

> It is known to the affiant that the Manchester Police Department has received
> numerous complaints about Alberto Harris selling controlled substances from
> his residence located on Pennington Hill.  The confidential witness in this case
> has been used several time in the past by the Manchester Police Department as
> well as [by] other agencies and has proven to provide reliab[l]e information to
> law enforcement.

[*Id.*]

The affidavit is signed and dated 7:03 p.m., September 16, 2010.  [*Id.*]   Based upon

the affidavit, a search warrant was issued that same day for the search of Harris's residence,

including for "Xanax and any other controlled substance…" along with "any proceeds

---

[4]      Neither Goins nor Robinson reviewed the audio/video recording prior to application
for the search and arrest warrants, or prior to their execution.  [*See* Record No. 84 at 22 (Goins
depo. at 85); Record No. 83-7 at 5-6; Record No. 85 at 28 (Robinson depo. at 108).]
Accordingly, the only basis for corroborating the confidential informant's story includes: (1)
the citizen complaints, (2), the physical evidence of one generic Xanax pill and eight dollars
in change, (3) Little's history as a CI, which provides a basis for her credibility, (4) the threat
of prosecution for making a false statement, and (5) the fact that she was aware that her actions
were being recorded.

including sums of U.S. currency…that appear to be proceeds derived from sales of controlled substances." [Record No. 83-18 at 23-24]  The arrest warrant also dated September 16, 2010, states "[a]ffiant says that on 9-16, 2010, in Clay County, Kentucky, Defendant unlawfully: sold Xanax to confidential witness for MPD – paid $12.00 for Xanax." [Record No. 83-18 at 50-51]

Both the search and arrest warrants are dated by Goins as executed on September 16, 2010.  An investigative report made part of the record documents the execution of both warrants and clearly states that Harris was "placed under arrest for the arrest warrant that had been obtained for him." [Record No. 83-18 at 10]

> Upon arresting Harris, Officer Stewart retrieved Harris's wallet from his pant pocket out of the pants he was wearing and gave it to me.  Myself and Sheriff Johnson then proceeded to look through Harris's wallet for the 2-$10.00 bills of U.S. currency that had been used by Manchester Police Department. . . Myself and Sheriff Johnson then located the two $10.00 bills in Harris's wallet. (the identification numbers that were recorded by myself earlier this date for the transaction were the same as what was named in the affidavit for the search warrant.)

[Record No. 83-18 at 10-11]

According to the investigative report and the plaintiff's deposition, Harris was not home at the time the officers arrived to execute the warrants, but he arrived home while the search was taking place. [Record No. 83-18 at 10; Record No. 86 at 25-26 (Harris depo. at 100-101)] Goins's investigative report indicates that, prior to Harris arriving home, officers located a large quantity of pill bottles in the back bedroom. [Record No. 83-18 at 10] Goins attests that he "discovered a clear plastic container with a lid on it and no label [together on the nightstand with the other pill bottles] that contained 10 and 2 halves of Xanax tablets identical to the Xanax table [that] Harris had sold the confidential witness earlier in that same day." [*Id.*] The

investigative report states that the search began at approximately 21:00 hours, that the pill bottles were discovered at approximately 21:27 hours, and that Harris arrived home at approximately 21:50 hours.  [*Id.*]

Following documentation of the evidence and seizure of Harris's vehicles, the report outlines that "Harris was released to the Clay County Jail and charged with two counts of trafficking controlled substances within 1,000 yards of a school, the school being Eastern Kentucky University."  [Record No. 83-18 at 11]  A diagram from the Kentucky Department of Transportation was included demonstrating that Harris's residence was "well within 1,000 yards" of the school.  [*Id.*]    The investigative report concludes, "Alberto Harris sold a confidential witness one Xanax tablet and had in his residence for the purpose of selling, more Xanax tablet in which the residence is within 1,000 yards of Eastern Kentucky University."  [*Id.*]

Goins testified during the preliminary hearing held on September 27, 2010.  [*See* Record No. 84-3 ("Transcript of Preliminary Hearing Testimony on 9/27/2010").]  Goins was questioned by the Commonwealth Attorney and then cross-examined by defense counsel.  [*Id.*]  Relevant excerpts of the transcript are as follows:

> CA: And was [the confidential informant] checked like you all check them to make sure uh you know he was ready to do the confidential buy thing?
>
> Goins:  Yes.  It's one we've used several times.
>
> …
>
> CA:  (discussing the CI returning with Xanax) Okay. And did he say he bought it from Alberto Harris?
>
> Goins:  Yes.
>
> CA:    And does your ev…other evidence that collaborates that does it collaborate?
>
> Goins:  Yes.

. . .

[Cross Examination]

Defense Counsel:  And was this buy videotaped?

Goins:  Yes ma'am.

Defense Counsel: (Inaudible) could you see the pill actually transfer?

 Goins:  I have not seen the tape the video uh to its entirety.

Defense Counsel:  So you don't know?

Goins:  I uh like I said, Detective Robinson watched it.  I haven't watched it yet.

…

Defense Counsel:  You said this was a confidential informant that's been used before?

Goins:  Yes ma'am.

Defense Counsel:  And you had searched him prior to entering the residence?

Goins:  Yes.

Defense Counsel:  Now was any [] officers following him where they could view him entering the residence?

Goins:  No.

…

Defense Counsel:  Uh was the confidential informant promised anything in return for informing this sale or buy?

Goins:  The confidential informant is like the they're uh they're paid.

Defense Counsel:  So he didn't have any pending charges or anything like that?

Goins:  No ma'am.  I should say not that I'm aware of I mean.

Defense Counsel:  But to our knowledge note that he wasn't promised anything other than compensation?

Goins:  It's that's standard I mean all we do is pay 'em.  They're like just employed.

[Record No. 83-7]  The judge found probable cause, and set bond at $1,000 full cash following the preliminary hearing.   [Record No. 83-8 at 1]

On October 7, 2010, the case was presented to a grand jury.  Goins again testified. [Record No. 84-6]  The substance of his testimony is as follows:

Q:  Tell us what happened please.

A:  Let's see, on September 16th, 2010, myself and UNITE Det. Patrick Robinson working with a confidential informant, the, an informant had told myself and Det. Robinson that Mr. Harris, Alberto Harris had contacted her, told her that, that he had obtained some Xanax medication that he was wanting to sell, wanting to know if she wanted to buy some, so myself and Det. Robinson then placed informant with audio/video recording device, gave informant some money to purchase the controlled substances with, the informant then went to his residence, which is located on Pennington Hill in Manchester, which he, he sold her xanax medication.  Then the informant was given two $10 bills to buy the drugs with from Mr. Harris.  And then the serial numbers from the money had been recorded by us before giving them to the informant to use to purchase the medication and then on the same day, after this transaction took place, on the same date, that night, on the 16th, a search warrant was obtained and executed at the residence of Alberto Harris in which officers discovered the, a bottle of, not a prescription bottle but just a clear container of same identical medication or controlled substance and which was purchased from Harris that same date.  He has no prescription for it and also when officers got Harris' billfold out of his pocket, that he had in his pants pocket, our two $10 bills we'd used to buy the drugs from him that day was in his billfold.

Q:  What pills did you get off of him that night?

A:  Just xanax.  More xanax.  But he was charged, he's been charged with two counts of trafficking in a controlled substance within 1,000 yards of a school.  That school would be the new Eastern College.

Q:  And he, was he actually on parole at this time he done this?

A:  Yes.  He's on, he's currently on parole for, got out of prison for selling drugs.

[Record No. 84-6]

An indictment was returned in open court on November 4, 2010.  [Record No. 87-1] Harris was arraigned on December 6, 2010, and pleaded not guilty.  [Record No. 83-8]  A pretrial conference was set for January 3, 2011.  [*Id.*]  On that date, defense counsel sought a new pretrial conference date because she had not received the video evidence.  After further delays, including a delay due to an illness of appointed counsel, Judge House dismissed the

-10-

felony indictment against Harris, finding a lack of jurisdiction over a misdemeanor.[5]  [*Id.* at 3; Record No. 87-2]

On August 9, 2011, a new felony indictment was returned for Harris in open court, charging Harris, based upon the same conduct, with two counts of Trafficking in Controlled Substance, Third Degree, Second or Subsequent Offense, in violation of KRS 218A.1414(1), and one Count of being a Persistent Felon Offender, First Degree, in violation of KRS 532.080. [Record No. 87-3]  The Third Count was later dismissed in light of House Bill 463, which modified application of the Persistent Felony Offender charge.[6]  No transcript exists of this grand jury proceeding.

Harris was released from custody on December 9, 2011, pursuant to a $20,000 surety bond and after 450 days of incarceration.  [Record No. 83-8 at 3]  However, the surety bond was revoked by the securing party on March 6, 2012, and Harris was re-booked at the Clay County detention center.  [*Id.* at 4]  Harris remained incarcerated until a surety bond was again posted on May 23, 2013, for a total of 444 days.  [*Id.* at 6]  Based on the timeline filed by defendants, Harris was incarcerated for a total of 894 days.  The charges against him were dropped on September 10, 2014, or 3 years, 11 months, and 26 days after his initial arrest.

In light of his lengthy incarceration, and even longer delay until final dismissal of his charges, Harris filed this suit accusing Goins and Robinson of conspiring to deprive him of his constitutional rights, and attempting to keep him incarcerated as long as possible.  Harris

---

[5]        Effective March 16, 2011, KRS 218A.1411 was amended to reduce the proximity to a school from 1,000 yards to 1,000 feet.  *See* http://www.lrc.ky.gov/record/11rs/hb121.htm Accordingly, the charge against Harris was no longer a felony charge.

[6]  *See* http://www.lrc.ky.gov/record/11RS/HB463.htm

alleges motive on the part of Robinson as retaliation for a civil suit filed by Harris nearly a decade earlier, which was resolved in a settlement in Harris's favor.  Harris alleges that Robinson conspired with Goins, Little, and Philpot to fabricate evidence against him, and to keep him wrongfully incarcerated.  In his Complaint, Harris alleges that he does not appear on the buy video, that he was not home on that date, that Little planted the Xanax pills at his residence, and that the officers planted the marked bills in his wallet.

Contrary to the assertions in his Complaint, there is substantial evidence inculpating Harris in the offense charged.   For example, during his deposition testimony, Harris admits that it was his voice on the controlled buy video, admits that he may have been at his residence during the day on September 16, 2010, admits that he possessed Xanax pills (though apparently as a prescription), admits that Christina Little often came to his residence alone, and admits that he has, in the past, permitted Little to take his Xanax, such as after the two engaged in sexual conduct.  [*See* Record No. 83-1 at 6 (citing Harris deposition).]  Moreover, Harris has no evidence, apart from his own speculation, that the officers planted the marked bills in his wallet, that the officers held animus against him for the decade-old civil settlement, that the officers conspired to frame him, or that the officers specifically conspired with Little and Philpot to frame him for distributing Xanax.  Finally, Harris has no evidence to suggest collusion between the individual defendants and the Commonwealth Attorney to intentionally prolong incarcerated out of animus.

Further, there is no evidence that Robinson and Goins concealed any plainly *exculpatory* evidence.  The only alleged omissions made by Goins both in his affidavit accompanying the search (and arrest) warrants and his preliminary hearing testimony is that the CI video does not actually capture the drug transaction (it merely establishes that Little

-12-

was at Harris' residence and that there was some exchange of money), the existence of Philpot as Little's driver, and Little's motivation to act as a confidential informant (possible reduced charges for Philpot).  The record establishes four instances in which Little acted as a CI prior to September 16, 2010, and a fifth instance on the same date.  [*See* Record No. 83-1 at 5 n.1 (citing Record No. 83-14 ("CI Investigative Files").]

## II.

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The party moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists.  *CenTra, Inc. v. Estrin*, 538 F. 3d 402, 412 (6th Cir. 2008).  Once the moving party has met its burden of production, the nonmoving party must present "significant probative evidence" of a genuine dispute to defeat the motion for summary judgment.  *Chao*, 285 F.3d at 424.  The nonmoving party cannot rely upon the assertions in its pleadings; rather, it must come forward with probative evidence, such as sworn affidavits, to support its claims.  *Celotex*, 477 U.S. at 324.  In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in

the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a defense of qualified immunity is asserted, however, the analysis is somewhat altered. That is, the existence of a disputed, material fact does not necessarily preclude summary judgment if the defendants cannot be shown to have violated clearly-established law. *See Pearson v. Callahan*, 555 U.S. 223, 243 (2009); *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that he was deprived of a right secured by the Constitution or laws of the United States and the deprivation was caused by a person acting under color of law. *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). Because the conduct at issue in this case was undertaken in the officer's official capacity, there is no dispute that they were "acting under color of law." Moreover, while not natural persons, the municipal entities and UNITE may be liable under § 1983 based on municipal customs and conspiracy theories, as presently alleged. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978); *Jackim v. Sam's East, Inc.*, 378 F. App'x 556, 563 (6th Cir. 2010) (citing Cooper v. Parrish, 203 F.3d 937, 952 n. 2 (6th Cir. 2000).

### III.

#### a. Malicious Prosecution under §1983

The gravamen of Harris's claim, unlawful arrest and prolonged pre-trial detention without probable cause, is fully encompassed by Count I, alleging malicious prosecution. Harris claims that Defendants Robinson and Goins fabricated and falsified evidence against him, initiated a prosecution without probable cause, and took steps to continue that prosecution despite a lack of probable cause. [*See* Record No. 1 at ¶¶ 108-116.] "The Sixth Circuit

-14-

recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment, which encompasses wrongful investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715-16 (6th Cir.2006)) (internal quotation marks omitted). *See also Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 920 (2017) ("the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process").

To succeed on a § 1983 malicious prosecution claims a plaintiff must prove four elements:

> (1) a criminal prosecution was initiated against the plaintiff, and the defendant made influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Sanders v. Jones*, 845 F.3d 721, 728 (6th Cir. 2017), as amended on denial of reh'g (Mar. 20, 2017) (citing *Sykes*, 625 F.3d at 308-09). Inexplicably, the parties have not addressed when exactly Harris's "prosecution" was initiated.

However, the record is clear that Harris was arrested pursuant to an arrest warrant obtained by Goins. According to Goins's own investigative report, on September 16, 2010, at approximately 21:50 hours, Harris was "placed under arrest for the arrest warrant that had been obtained for him." [Record No. 83-18 at 10; *see id.* at 20-22] According to the Restatement (Second) of Torts, "one who, personally or by a third person for whose conduct he is responsible under the law of agency, presents to a magistrate a sworn charge upon which a warrant of arrest is issued, initiates the criminal proceedings of which the issuance of a warrant is the institution." Restatement (Second) of Torts § 653 (1977); *see Martin v. O'Daniel*, 507

-15-

S.W.3d 1, 10 (Ky. 2016), as corrected (Sept. 22, 2016), reh'g denied (Feb. 16, 2017) (citing Restatement); *Roberts v. Thomas,* 135 Ky. 63, 121 S.W. 961, 962 (1909) ("The person who procured the warrant to be issued and thus caused the arrest is liable to an action for malicious prosecution…").  While the elements of malicious prosecution under § 1983 (as articulated by the Sixth Circuit) and under Kentucky law are distinct, there is no indication that the definitions of "initiate" vary.  *Sykes v. Anderson*, 625 F.3d 294, 315 n.13 (6th Cir. 2010), involved a § 1983 malicious prosecution claim.  The court referenced Michigan law to determine when a prosecution is "initiated."  For the purpose of Harris's claim, the prosecution was initiated with the swearing of the warrant affidavits, pursuant to Kentucky law. [7]

Apart from the "when" question, there is no doubt regarding the "who" question—the defendants do not contest that they were responsible for initiating Harris's prosecution.  Goins

---

[7]    There is some basis to suggest that Harris's claim from the time of his arrest until his preliminary hearing would more appropriately be construed as a claim for false arrest.  For example, in *Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006), the Court characterized malicious prosecution claims as more aptly named the "right to be free of continued detention without probable cause," wherein the use of "continued" calls into question the definition of "initiation."  However, the weight of authority favors distinguishing claims based on whether the arrest was pursuant to a warrant.  *See Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995) ("The distinction between false imprisonment and malicious prosecution in the area of arrest depends on whether or not the arrest was made pursuant to a warrant."); *Donovan v. Thames*, 105 F.3d 291, 298 n.7 (6th Cir. 1997) (adopting *Singer*); *Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 3 (1st Cir. 1995) ("The critical inquiry that distinguishes malicious prosecution from false arrest in the present context is whether the arrests were made pursuant to a warrant."); *but see Buchanan v. Metz*, 132 F. Supp. 3d 922, 936-37 (E.D. Mich. 2015), aff'd, 647 F. App'x 659 (6th Cir. 2016) (analyzing claim as false arrest despite existence of arrest warrant).

This distinction matters for purposes of the statute of limitations, but the defendants do not take a position on the issue.  Rather, they simply acknowledge that "although wrongful arrest is not specifically alleged as an individual count, false arrest and malicious prosecution are the underlying constitutional violations or unlawful acts underlying Harris's claims…" [Record No. 83-1 at 9]

applied for the arrest warrant, and Goins's investigative report makes clear that Harris was arrested pursuant to that warrant. Therefore, as argued by the defendants, the key issue for the Rule 56 motion is probable cause.

Here, the merits question of probable cause coincides with the defendants' qualified immunity assertion. A finding of probable cause would not only nullify an element of the malicious-prosecution, but would entitle the officers to immunity from suit. "[U]nder § 1983, an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Miller v. Sanilac County*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008)).

### 1.    Qualified Immunity

"Law-enforcement officers enjoy qualified immunity from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *King v. Harwood*, 852 F.3d 568, 582 (6th Cir. 2017) (quoting *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). "Where a defendant moves for summary judgment based on qualified immunity, the plaintiff must first identify a clearly established right alleged to have been violated and second, establish that a reasonable officer in the defendant's position should have known that his conduct violated that right." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Therefore, the Court looks both to whether the right is clearly established, and whether the officer acted reasonably.

-17-

It is clearly established that individuals have a right to remain free from arrest without probable cause. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005). Moreover, there is no dispute among the parties that

> individuals have a clearly established Fourth Amendment right to be free from malicious prosecution by a defendant who has "made, influenced, or participated in the decision to prosecute [a] plaintiff" by, for example, "knowingly or recklessly" making false statements that are material to the prosecution either in reports or in affidavits filed to secure warrants.

*King*, 852 F.3d at 582-83 (quoting *Webb v. United States*, 789 F.3d 647, 665 (6th Cir. 2015)). Because the plaintiff's right to be free from malicious prosecution and arrest without probable cause are clearly established, the Court looks to whether the officers acted reasonably. Here, however, the defendants' arguments are insufficient for the Court to make such a determination.

The defendants rely upon the fruits of the search of Harris's home and person to establish probable cause for his arrest, binding over for trial, indictment and pre-trial detention. [*See, e.g.,* Record No. 83-1 at 11 (noting discovery of buy money as basis for probable cause determination).] But as clear from Goins's report, Harris was arrested pursuant to an arrest warrant that *preceded* the search and discovery of that evidence. It is well-established that an arrest may not be justified by evidence discovered after the fact. "Probable cause must exist and must be known by the arresting officer at the time of the arrest." *White v. Commonwealth*, 132 S.W.3d 877, 883 (Ky. Ct. App. 2003) (citing *Sampson v. Commonwealth*, 609 S.W.2d 355, 358 (1980)). The Eleventh Circuit has held expressly:

> [w]hen the warrant issues and the arrest occurs before an indictment is handed down, however, the question whether probable cause existed for the arrest must be answered by reviewing the facts that were before the magistrate. Accordingly, support in this case for a finding of probable cause must be found in the affidavit accompanying the application for the warrant.

-18-

*Garmon v. Lumpkin Cty., Ga.*, 878 F.2d 1406, 1409 (11th Cir. 1989); *cf. Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 307 (6th Cir. 2005) (citing *Garmon* for the proposition that "[a] subsequent indictment does not retroactively provide probable cause for an arrest that has already taken place.").

The Supreme Court in *Malley v. Briggs*, 475 U.S. 335 (1986), concluded that officers responsible for obtaining arrest warrants are subject to qualified immunity, and the same standard applies in the context of a suppression hearing; that is, objective reasonableness. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Greene v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996) (quoting *Malley*, 475 U.S. at 341).  In making this determination, the Court considers the facts known to the officer "at the time he swore the complaint." *Ireland v. Tunis*, 113 F.3d 1435, 1449 (6th Cir. 1997).  And at the Rule 56 stage, the Court views those facts in the light most favorable to the plaintiff. *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013) (citing *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011).

Under the above standard, the Court finds a genuine issue of material fact regarding the validity of the arrest warrant, and whether a reasonable officer would believe there was probable cause to arrest.  The arrest warrant affidavit is as follows: "[a]ffiant says that on 9-16, 2010, in Clay County, Kentucky, Defendant unlawfully: sold Xanax to confidential witness for MPD – paid $12.00 for Xanax."  [Record No. 83-18 at 50-51]  The Kentucky Supreme Court has noted, citing guidance from the Attorney General:

-19-

> for a complaint not based on the personal observation of the affiant to be
> sufficient to support a warrant of arrest, it must disclose (1) the name of the
> informant, (2) the factual observation he has made and not just the "ultimate
> fact" of the offense, and (3) how, when and where such observation was made.

*Talbott v. Commonwealth*, 968 S.W.2d 76, 81 (Ky. 1998). Even assuming that the *search* warrant affidavit was considered in issuance of the arrest warrant,[8] the plaintiff has demonstrated a genuine issue regarding whether the facts were sufficient for a reasonable officer to believe there was probable cause.

As a general rule, an invalid arrest warrant is of no moment if the arrest is otherwise supported by probable cause. *See Graves v. Mahoning County*, 821 F.3d 772, 776 (6th Cir. 2016); *Talbott v. Commonwealth*, 968 S.W.2d 76, 81 (Ky. 1998) ("However, despite the invalidity of the warrant, the arrest was valid if Harlow, himself, had probable cause to believe that Appellant had committed a felony."). Here, there is no suggestion by the defendants that, even if the arrest warrant was invalid, Harris's arrest was otherwise supported by probable cause. The evidence upon which the defendants' rely to demonstrate probable cause—the

---

[8]    In *Greene v. Reeves*, 80 F.3d 1101 (6th Cir. 1996), the Sixth Circuit overturned a district court's distinguishing between an arrest warrant and a search warrant where "both findings must ultimately stand or fall on the same evidence." *Id.* at 1106. In articulating the slightly different enunciation of the requirements, the court recognized that "[w]hile the focus of the two tests is of course different—whether the person has committed a crime or whether evidence of a crime will be found—the prudent person standard is the same." *Id.* And while it is certainly possible that there may be probable cause for one but not the other, "[i]t is generally assumed by the Supreme Court and the lower courts that the *same quantum of evidence* is required whether one is concerned with probable cause to arrest or probable cause to search." *Id.* (quoting 1 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 3.1(b), at 544 (emphasis added)). The *Reeves* Court held that, because the evidence was the same, "[i]f it was reasonable to obtain a search warrant, it had to be equally reasonable to obtain the arrest warrant." *Id.*

marked bills—were not discovered until *after* Harris was arrested.[9]  The officer who actually arrested Harris is no longer a defendant in this case, and it is unclear what facts were known to that officer at the time, other than (presumably) that there was a warrant for Harris's arrest.[10] What is clear is that Goins, who was working with Robinson, set the prosecution in motion by obtaining an arrest and search warrant.  The plaintiff argues that the warrants are invalid because the officers may not simply rely upon the statement of a confidential informant, especially one whose credibility may seriously be questioned.  The defendants have no response to this point because their probable cause argument relies wholly on evidence obtained during the search and arrest that took place pursuant to the warrants.

The moving party has the burden of showing that there is no genuine issue of material fact to warrant a probable cause finding.  Here, the defendants cannot meet their burden given their failure to account for the actual sequence of events.

Even if the Court were to consider the question not readily briefed by the defendants, it is unlikely the Court could conclude that the officers are entitled to qualified immunity.  The question would turn on, whether in light of previous citizen complaints (which are not documented, but are attested to in three depositions), together with the statement of an eyewitness confidential informant (and no independent corroboration of the CI's story, such

---

[9]    The Court does not address the propriety of the search warrant (although the plaintiff disputes its validity) other than to note that if the search warrant were valid, the marked bills would likely have been discovered pursuant to the search warrant, as it specifically included a search for currency.

[10]    Again, the investigative report's statement that Harris was arrested pursuant to the search warrant casts doubt on other possible arguments, such as under the collective knowledge doctrine, *see, e.g., Brumley v. Comonwealth*, 413 S.W.3d 280, 286 (Ky. 2013); *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012), that Harris's arrest was warranted by the finding of matching Xanax pills.

as a drive-by of the plaintiff's residence or a review of the video), is enough "to justify a prudent person in believing that the [the plaintiff] had committed an offense." *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010).

"When an affidavit relies on hearsay information from a confidential informant, the judicial officer (and reviewing court) must consider the veracity, reliability, and basis of knowledge for that information as part of the totality-of-the-circumstances review." *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010). In *Illinois v. Gates*, 462 U.S. 213, 242 (1983), the Supreme Court held that an officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge."

In the present case, the defendants' argue that the confidential informant was inherently reliable because she had conducted numerous past buys. As stated in the affidavit for the search warrant, "[t]he confidential witness in this case has been used several time in the past by the Manchester Police Department as well as [by] other agencies and has proven to provide reliab[l]e information to law enforcement." [Record No. 83-18 at 20-22] However, while the CI had performed at least five controlled buys on four targets for the Manchester Police department at the time Goins swore the affidavit, none of those individuals had been prosecuted. [*See* Record No. 83-14 ("CI Investigative Files").] In fact, one of the buys had only taken place that morning. [*Id.* at 18] Another of the targets was not pursued due to the quality of the video [Record No. 106 at 4], and a sixth referenced by defendants did not even take place until two months later (November 17, 2010). [*See* Record No. 83-14 at 12; *see also* Record No. 83-1 at 5 n.1.]

-22-

Thus, it is not clear that the confidential informant was *proven reliable* as of September 16, 2010.  And *post-hoc* credibility determinations are insufficient.  For the Court to find at this stage of the proceedings that the confidential informant were proven reliable, there would need to be facts in the record indicating that the officers *knew on September 16, 2010*, that the confidential informant had a track record of providing reliable information.  The defendant's attestation to such on the warrant affidavit is not conclusive of the fact, and the materials provided in the record are wholly inconclusive regarding whether any of the targets of the CI's controlled buys had even been arrested prior to September 16, 2010.  The fact that they were later arrested (and that a successful buy was conducted in November 2010) does not speak to the facts known to the officers at the time.

Moreover, there is testimony that more than simply the word of the confidential informant is needed.  Chief Fultz testified that something as simple as driving by to ensure the informant actually went to the house identified would have counted as corroboration.  [Record No. 90 at 10 (Fultz depo. at 34-36)]  But the record demonstrates that the officers did not drive by, nor did they review the video.  Therefore, the sole corroboration was the confidential witnesses' own veracity (which the plaintiff strongly questions), and the citizen complaints (which are undocumented).[11]  The confidential informant's husband, a known drug dealer, accompanied her on the buy in question in hopes of having his own charges reduced.  The plaintiff provides evidence in the record of this.  [Record No. 102 at 11 ("According to Goins, he arranged for Little to be used as an informant so that Philpot would be shown leniency on his criminal charges."  citing Record No. 84 at 13 (Goins depo. at 46-47))]  But there is no

---

[11]     To be sure, Goins, Robinson, and former-defendant Johnson all testified to the presence of citizen complaints.  [*See* Record No. 106 at 3]

evidence that the officers searched Philpot to confirm that he was not concealing substances (though it is stated on the video that there are no drugs in Little's vehicle, which would presumably mean *on Philpot*, the driver). The Court cannot hold that these facts, including no further steps to ensure the truthfulness of the eyewitness who had motive to lie, "justify a prudent person in believing that the [the plaintiff] had committed an offense." In light of the factual issues, the Court cannot at this stage determine whether the officers are entitled to qualified immunity.

Likewise, because of the factual dispute, the Court cannot conclude that probable cause existed for the arrest, sufficient to negate the malicious prosecution claim.

> In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible. But under § 1983, an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent.

*Miller v. Sanilac County*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008)). The probable cause determination must be left for the jury based on the factual issues presented.

### 2.    Impact of the Grand Jury Indictment

The defendant-officers also attempt to shelter themselves from the malicious prosecution claim based upon the probable cause determinations at the preliminary hearing and before the grand jury.[12] "[I]t has been long settled that the finding of an indictment, fair

---

[12]    Here, if the initiation of the malicious prosecution claim began with the arrest warrant, it is not clear that the preliminary hearing or grand jury determinations of probable cause can be conclusive, because they are based on evidence discovered post-arrest. Such logic might justify construing the claim arising from the arrest as a false arrest claim (despite the presence of a warrant). Conversely, it should be noted that even if the initial arrest is supported by

-24-

upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006) (quoting *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002)) (internal quotation marks omitted). *See also Cook v. McPherson*, 273 F. App'x 421, 423 (6th Cir. 2008) (affirming District Court's holding that "[a]s a matter of law, Plaintiff's indictment is dispositive of his § 1983 malicious prosecution claim, notwithstanding his allegations—however bare—of improper testimony in front of the grand jury.").

The defendant-officers wish to shield themselves by this logic, and by the District Court's holding in *Cook*. [Record No. 83-1 at 13]    However, when "a police officer[] suppl[ies] false information to establish probable cause," the probable-cause presumption does not necessarily stand. *Hinchman v. Moore*, 312 F.3d 198, 203 (6th Cir. 2002) (applying Michigan law). For example, in *Sankar v. City of New York*, the court did not find the grand jury determination to be conclusive or grant the police officer immunity from suit because there was a genuine fact issue regarding the propriety of the police officer's "'filing of a sworn complaint' and 'involvement in laying the groundwork for an indictment.'" *Sankar v. City of New York*, No. 07 CV 4726 RJD SMG, 2012 WL 2923236, at *3 (E.D.N.Y. July 18, 2012) (on motion for reconsideration). Here, where the plaintiff alleges falsification of evidence (reason to doubt the CI's credibility, etc.), the after-the-fact determinations are not necessarily conclusive.

---

probable cause (and thus the officers are entitled to qualified immunity), such immunity should not bar liability for a subsequent malicious prosecution claim where, for example, officers fabricate evidence post-arrest which is then used in (and material to) the prosecution.

In *Rehberg v. Paulk*, 566 U.S. 356 (2012), the Supreme Court extended absolute immunity, rather than qualified immunity, to law-enforcement officers for their acts as grand-jury witnesses.[13]  *See King v. Harwood*, 852 F.3d 568, 584 (6th Cir. 2017).  But, distinguishing previous cases, the Sixth Circuit in *King* held that the key determination in whether grand jury testimony is conclusive of immunity is whether the officer "set the prosecution in motion." 852 F.3d at 586.  According to *King*, "evidence of an officer's actions prior to and independent of his grand-jury testimony may call into question the presumption of probable cause created by an indictment even if a malicious-prosecution plaintiff may not bring in evidence of the grand-jury testimony *itself* to do so."  *Id.* at 590 (emphasis in original).

*King* outlines the standard to be applied, with the key element being knowing or reckless false statements, and those statements (or omissions) material to the ultimate prosecution.

> We hold that where (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury), the presumption that the grand-jury indictment is evidence of probable cause is rebuttable and not conclusive.  This exception to the presumption of probable cause finds support in Supreme Court caselaw, in our precedent, and in the decisions of our sister circuits and the district courts.

852 F.3d at 587-88.[14]

---

[13]    The defendant-officers do not assert absolute immunity in light of their grand jury testimony.

[14]    *King* also cited the recent Supreme Court decision of *Manuel v. Joliet,* 137 S.Ct. 911 (U.S. Mar. 21, 2017), which held that "even though a judge found there was probable cause

It is not clear from the text whether "misleading omissions" satisfy the first factor of the test.  The plaintiff alleges that Goins's statement at the preliminary hearing that the CI had no outstanding charges (and was only paid) is a *false statement*, in light of a pending warrant in Ohio.  [Record No. 102 at 9]  The defendants contend that that warrant was settled in 2008.  [Record No. 106 at 4]  Even so, Goins clearly omitted the fact of Lonnie Philpot's presence, who (even if not a paid informant) was there assisting his wife in the hopes of having his charges reduced.  Whether these omissions were "material" is a question for the jury unless "reasonable minds could differ."  *See Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) (citing *United States v. Gaudin*, 515 U.S. 506, 512 (1995)).  The Court at this juncture cannot make a definitive determination under the *King* test, because there is, at the very least, a genuine issue as to the materiality of Goins's allegedly-false testimony/omissions while setting the prosecution in motion.  This, of course, assumes that testimony at the preliminary hearing counts as setting the prosecution in motion.

While the Court in *King* found both that its test was met *and* that the defendant was not entitled to immunity based on the grand jury's indictment, the two are not the same determination.  Even if there was a question as to the materiality of the false statements or omissions, if probable cause otherwise exists (independent of any false statements or omissions), then summary judgment would be appropriate.  That is to say, *King* is a threshold

---

for the charge on the day of arrest, and even though a grand jury returned an indictment twelve days later," that a Fourth Amendment claim for unlawful pretrial detention could proceed.  852 F.3d at 588.  "Whatever its precise form, if the proceeding [finding probable cause] is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights." 137 S.Ct. at 915, 916.

test as to the conclusiveness of the grand jury's probable cause determination.  Failure of the *King* test is not conclusive as to whether summary judgment is appropriate.

However, the two are one-in-the same in the present case.  Materiality is a question for the jury, unless only one outcome is reasonable.  A reasonable jury could conclude that the presence of a second confidential informant, who had pending charges, was material to the probable cause determination.  Therefore, the Court is unable to make a determination as to probable cause at the summary judgment stage.

And because there remains a genuine issue regarding whether a reasonable officer would believe probable cause existed for the arrest warrant, the Court cannot make a determination regarding the officers' qualified immunity.[15]  Moreover, because questions remain as to the materiality of alleged misdeeds taken in support of Harris's prosecution (reasonable jury could conclude that the presence of a second confidential informant, who had pending charges, was material to the probable cause determination), the Court cannot conclude that the grand jury findings of probable cause are conclusive.[16]

---

[15]    The plaintiff makes much of the missing transcript for the second grand jury proceeding.  But because Goins's is absolutely immune from suit based on his grand jury testimony *alone*, *see King*, 852 F.3d at 587 (falsifications or omissions "solely" during grand-jury testimony not sufficient to overcome immunity); *Sanders*, 845 F.3d at 730 (immunity persists where cause of action cannot be proven without grand-jury testimony), the substance of that testimony is inapposite.  So to say, should the jury find that any pre-testimony misdeeds were not material, the latter grand jury indictment would be conclusive of probable cause.

[16]    Defendant Christian Little's admissions are the subject of a Motion to Withdraw Admissions [Record No. 122], but not properly before the Court for purposes of the pending Rule 56 motions and have no bearing on the Court's rulings.  *See Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565, 566 (11th Cir. 1987) ("Clearly, the deemed admissions of his codefendants cannot bind Morris where he actually responded to plaintiff's requests in a timely and legally sufficient manner."); *Kittrick v. GAF Corp.*, 125 F.R.D. 103, 106 (M.D. Pa. 1989) (collecting cases on impact of co-defendant admissions); *Lundquist v. United States*, 116 F.3d 1486 (9th Cir. 1997) (acknowledging "the general rule that one party's admissions ordinarily

b.    **Due Process Violation**

Somewhat confusingly, Harris alleges violations that his "right to a fair trial" was violated.  [Record No. 1 at 16 ¶118]    He argues that the "[d]efendants' deliberate and intentional concealment, suppression and destruction of exculpatory and impeachment information directly and proximately caused Harris' unfair trial and deprivation of liberty without due process of law during his lengthy incarceration, as well as all the ongoing injuries and damages set forth above."  [*Id.* at ¶119]  He further argues that the defendant's failed to conduct a constitutionally-adequate investigation, in violation of his due process rights, and that [because of] the "[d]efendants' collective drive to pursue Harris' wrongful prosecution and incarceration, [d]efendants deliberately engaged in arbitrary and conscious-shocking conduct that contravened fundamental canons of decency and fairness and violated Harris' substantive due process rights under the Fourteenth Amendment."  [Record No. 1 at 17, ¶¶123, 124]

"[P]laintiffs bringing section 1983 procedural due process actions [bear] the burden of pleading and proving "that state remedies for redressing the wrong are inadequate." *Watts v, Burkhart*, 854 F.2d 839 (6th Cir. 1988) (quoting *Vicory v. Walton*, 721 F.2d 1062, 1065-66 (6th Cir. 1983).  "The failure to so plead in this circuit, therefore, renders a section 1983 complaint subject to dismissal." *Id.*  Moreover, the Sixth Circuit has never recognized a "constitutionally protected right to the manner in which a criminal investigation is conducted." *See Garner v. Harrod*, 656 F. App'x 755, 760 (6th Cir. 2016).  The plaintiff does not address

---

may not be used against a co-party," but denying relief in light of plaintiff's failure to object to admissibility on hearsay grounds/affirmatively stipulating to admissibility).

this pleading requirement in his consolidated response.  In fact, he does not address the defendants' due process arguments at all.

Regarding substantive due process, a plurality of the Supreme Court in *Albright v. Oliver*, 510 U.S. 266 (1994), "agreed that the substantive component of the Fourteenth Amendment's Due Process Clause, "with its scarce and open-ended guideposts," may not serve as the basis for a § 1983 malicious prosecution claim.  *Darrah v. City of Oak Park*, 255 F.3d 301, 308 (6th Cir. 2001) (quoting *Albright*, 510 U.S. at 275).  Moreover, the Sixth Circuit had "resisted application of shock-the-conscience claims in cases that do not involve physical force."  *Tinney v. Richland County*, No. 16-3125, 2017 WL 477961, at *4-5 (6th Cir. Feb. 6, 2017) (citing *Cassady v. Tackett*, 938 F.2d 693, 698 (6th Cir. 1991)).  Harris does not allege that force was used against him by Goins and Robinson, and disavows that mistreatment during his incarceration is relevant to liability in this case.  [Record No. 86 at 16; Record No. 102 at 26 ("Clay County has moved for summary judgment on claims that Harris never brought against them (or anyone) at all.") (citing Record No. 82-1 at 35-36)]

Because there is no genuine issue of material fact regarding the due process claim, judgment will be entered in the defendants' favor regarding this claim.[17]

---

[17]    The plaintiff asserts in his Consolidated Response that Goins's failure to identify Philpot to defense counsel during preliminary hearing cross-examination "is clearly a Brady violation."  [Record No. 102 at 36]  A violation of *Brady v. Maryland*, 373 U.S. 83 (1963), would be properly alleged as a procedural due process violation.  Nonetheless, Harris's *Brady* argument is unfounded.  There is no suggestion when, if at all, a *Brady* motion was made (the testimony in question took place during the preliminary hearing, a point at which *Brady* likely does not apply), and the presence of Philpot (along with his criminal record) *was* revealed to defense counsel when defense counsel inquired during pre-trial discovery as to who the second individual was in the confidential informant's car.  [*See* Record No. 88 at 12.]

-30-

c.      **Sixth Amendment Violations**

The plaintiff argues that "the extreme delay between Harris' arrest and his trial, which was itself a meaningless exercise, deprived him of this liberty interest as guaranteed by the Sixth Amendment, in violation of the Fourteenth Amendment's due process guarantees." [Record No. 1 at 19, ¶137]  Moreover, "Defendants acted with deliberate indifference to Harris' constitutional rights, which resulted in the deprivation of Harris' clearly established constitutional rights, including but not limited to his right to a speedy trial."  [*Id.* at ¶138] Assuming money damages are available under § 1983 for violations of Sixth Amendment rights, which is none too clear, *see e.g., Heyerman v. Count. of Calhoun*, 680 F.3d 642, 649 (6th Cir. 2012) (assuming without deciding) (Sutton, J., concurring), there is no basis in the record for the jury to find Goins and Robinson liable for the alleged violation of Harris's Sixth Amendment speedy trial right.  There is no evidence that Goins or Robinson were involved in the scheduling of Harris's trial, were responsible for any of the delays, or somehow conspired with those who were.  [*See* Record No. 83-1 at 7 (citing to Rader deposition).]

The plaintiff's theory is that the defendant-officers had a duty to monitor the status of pending cases.[18]  But according to the defendants, "[t]he MPD, the City of Manchester, and the individual officers in this case had no control over nor responsibility for the preservation of Harris' 6th Amendment rights."  [Record No. 83-1 at 18]  The plaintiff offers no response and fails to point to a single case finding police officer liability on a duty to monitor theory

---

[18]      Harris points to the deposition of now-Chief Fultz of the Manchester Police department, who explained that once he became Chief of Police, he instituted a system for monitoring pending investigations.   As a legal matter, violation of an internal police is not synonymous with violation of a constitutional right.  As a factual matter, Chief Fultz is clearly speaking of pending *investigation* (not yet turned-over for prosecution), rather than pending court cases.

(or, for that matter, on any theory).  *See, e.g., Hart v. Mannina*, 798 F.3d 578, 595 (7th Cir. 2015) ("We doubt that any of the defendant police officers could be proper defendants for [a Sixth Amendment speedy trial] claim, but that issue has not been presented.").  Suggesting that police departments have an affirmative legal duty to look over the shoulders of prosecutors and judges to ensure they are doing their jobs is, simply put, frivolous.

Were there facts in the record suggesting that Goins and Robinson colluded with the judge or prosecutors to keep Harris confined, the analysis would be different.  But Harris does not even make that suggestion.  On these facts, the plaintiff's remedy for his prolonged incarceration (should it be found unlawful), is *via* the Fourth Amendment.  Judgment will be entered in the defendants' favor on Count IV.

### d.    Failure to Intervene

Count III of the Complaint mentions "one or more defendants," and posits the theory that they "stood by without intervening to prevent the violation of Harris' constitutional rights." [Record No. 1 at ¶127]  However, Count III otherwise pleads municipal policy/custom liability against the City of Manchester, which is duplicative of Count VII.  [*See* Record No. 20 at 10-11; Record No. 1 at 22-23.]  Defendant Clay County is not identified in this Count, and the Consolidated Response does not contravene that assertion.  [*See* Record No. 82 at 28; Record No. 102.]  Therefore, judgment will be entered in favor of Clay County on Count III.

Goins, Robinson, and the City of Manchester address Count III as a properly-pled, failure to intervene claim.  Therefore, the Court will proceed to address the claim as such.  [*See* Record No. 83-1 at 16-17.]  To succeed, the plaintiff must show that the defendants "(1) observed or had reason to know that [constitutional harm] would be or was [taking place], and (2) had both the opportunity and the means to prevent the harm from occurring."  *Sheffey v.*

*City of Covington*, 564 F. App'x 783, 793 (6th Cir. 2014) (quoting *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)) (internal markings omitted).   Further, defendants cannot be held liable unless there was "a realistic opportunity to intervene and prevent harm." *Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (citing *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007)).  "Even nonsupervisory officers who are present at the scene of a violation of another's civil rights and who fail to stop the violation can be liable under section 1983."   *Smith v. Heath*, 691 F.2d 220, 225 (6th Cir. 1982).

The defendants argue that there is no evidence in the record that they "had either the opportunity or the means to prevent constitutionally based harm to Harris."  [Record No. 83-1 at 16]  They assert that the defendant-officers "had more than sufficient evidence at their disposal to support a reasonable conclusion Harris was engaged in violations of KRS 218A.1411," and because "there were no constitutional violation in any aspect of the investigation, arrest, charge, or prosecution of Harris which these Defendants could control," they are entitled to summary judgment.  [Record No. 83-1 at 17]  Particularly, they point out that "[l]aw enforcement does not and cannot direct the action of the judiciary or the prosecutors" and that "[b]eyond the arrest and grand jury testimony, these Defendants had zero control over the judicial process resulting in his continued incarceration, the dismissal of the charges against him, or any events while Harris was incarcerated."  [*Id.*]

Inasmuch as the defendants assert a lack of control over the judicial proceedings (beyond the grand jury indictment), the plaintiff offers no rebuttal as to how the defendants could intervene.  Rather, Harris contends that somehow Goins and Robinson violated a Manchester Police Department policy of reviewing pending cases.  [Record No. 102 at 37]  However, as mentioned above, this policy is related to active criminal investigations rather

than cases turned over for prosecution.  Manchester Police Chief Chris Fultz testified in his deposition that when he became Chief in 2011, he put a policy in place of reviewing "active criminal cases," wherein a supervisor reviews the cases every quarter.  [Record No. 90 at 16 (Fultz depo. at 58)]  When asked what is entailed during the review process, Fultz answered "[b]asically whether it's open or closed or ·something needs to be done in that investigation." [*Id.*]

Chief Fultz is obviously discussing pending criminal investigations, not pending criminal prosecutions.  The defendants assert that they have no control over the judiciary or the prosecution, and the plaintiff has not satisfied his burden of showing at least a material dispute as to this assertion.  Because there is no competent evidence under which a jury could conclude that the defendant-officers or the City of Manchester "had both the opportunity and the means to prevent" a Sixth Amendment violation, *Sheffey*, 564 F. App'x at 793, summary judgment is appropriate on Count III with respect to the Sixth Amendment issue.

However, regarding the Fourth Amendment claim, the defendants' argument under Rule 56 is that because there was probable cause and a constitutionally-sound investigation, no intervention was necessary.  Because the Court is unable to make a conclusive determination of probable cause at this stage, the defendant's theory necessarily fails. Accordingly, Count III may proceed as it relates to the malicious prosecution claim against Defendants Goins, Robinson, and the City of Manchester.

    e.    **Supervisory Liability**

In Count V, Harris names Robinson, along with former Defendant Kevin Johnson and "Unnamed Supervisors" as "supervisory personnel with (or acting for) Clay County and/or UNITE and/or the Manchester City Police with oversight responsibility for, and personal

-34-

involvement in, the training, hiring, screening, instruction, supervision, and discipline of individual law enforcement Defendants." [Record No. 1 at 19 ¶ 140]  According to Harris,

> [t]he supervisory Defendants knew or should have known that their subordinate officers and/or investigators were maliciously prosecuting civilians, fabricating evidence, coercing confessions, fabricating and pressuring inculpatory witness statements, suppressing and destroying exculpatory evidence, and depriving civilians of due process of law, and authorized, approved, encouraged, and/or directly participated in all of these unconstitutional practices.

[*Id.* at 19-20 ¶141]  Because Sheriff Johnson is no longer a party and any "Unnamed Supervisors" are not party to the present motions, the discussion here is limited to Robinson.

The defendants argue that "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." [Record No. 83-1 at 19 (quoting *Shehee v. Luttrel*, 199 F.3d 295, 300 (6th Cir. 1999)]  Moreover, "[a]t the very least, to recover, Harris 'must show the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'"  [*Id.* (quoting *Shehee*, 199 F.3d at 300)]    Finally, "[t]here is no proof that any constitutional violation occurred [or] that any supervisor could encourage or directly participate in." [*Id.*]

Of course, Harris alleges not only that Robinson implicitly authorized Goins's unconstitutional behavior, but that he, as the one with the improper motive, was the primary driver.  And, contrary to the defendants' assertion, there is sufficient evidence (enough to overcome a Rule 56 motion) that Harris's constitutional rights were violated, and that Robinson (a supervisor) directly participated in it.  Whether Robinson is actually liable as *Goins's* supervisor is an open question.

The plaintiff alleges in his consolidated response that Robinson was an officer of superior rank with the Manchester Police Department and, therefore, had obligations over defendant Goins.  [Record No. 102 at 38]  The record reflects that Robinson was technically employed by the Manchester Police Department and held the rank of Detective, whereas Goins was a Patrol Officer.[19]  [Record No. 85 at 5 (Robinson depo. at 14-16); Record No. 84 at 4 (Goins depo. at 11-12)]  The record is *not* clear regarding what formal or informal supervisory role/obligation a Manchester detective assigned to the UNITE task force has over a Manchester patrol officer.  That said, neither is there evidence identified by the defendants, nor argument establishing as a matter of law, that Robinson cannot be held liable in a supervisory capacity for Goins actions.  Therefore, summary judgment will not be entered with respect to Count V.[20]

### f.    Conspiracy under §1983

Count VI alleges that "the Defendants agreed among themselves and with other individuals, officers, supervisors, and others both within and outside Clay County and the City of Manchester, to act in concert in order to deprive Harris of his clearly established constitutional rights, as set forth above."  [Record No. 1 at 21 ¶149]  Harris claims that the defendants "acted in concert to facilitate and carry out numerous overt acts," "deliberately designed to frame Harris for crimes he did not commit," to include "intentionally concealing

---

[19]    The plaintiff's citation to Goins's deposition testimony [Record No. 102 at 38 (citing Record No. 84 at 8 (Goins depo. at 28))] is partially misleading.  Goins identifies Robinson as his supervisor, but only while Goins was employed by UNITE (which predates the time period at issue).

[20]    To the extent the Sixth Amendment argument is encompassed within Count V, judgment will be entered for defendants on that theory alone.

or destroying material, exculpatory, and impeachment evidence," "coercion of witnesses statements," "deceptive promises," "making false statements to the court and the grand jury, and otherwise fabricating and misrepresenting evidence so as to falsely inculpate Harris and to conceal Defendants' misconduct." [*Id.* at 21-22 ¶150] Harris alleges that the conspiracy and overt acts "proximately and directly caused Harris' arrest, malicious prosecution, wrongful incarceration, and deprivation of liberty without due process of law during his period of incarceration, as well as all the ongoing injuries and damages set forth above." [*Id.* at 22 ¶151]

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure another by unlawful action." *Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) (quoting *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir.2011)). To establish a conspiracy claim, a plaintiff must show that "(1) a single plan existed, (2) that defendants shared in the general conspiratorial objective to deprive the plaintiff of his constitutional rights, and (3) that an overt act of committed in furtherance of the conspiracy that caused the plaintiff's injury." *Id.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir.1985)) (internal marks omitted). "Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, ... [and] circumstantial evidence may provide adequate proof of conspiracy." *Webb*, 789 F.3d at 670.

The defendants make the following argument in their motion for summary judgment:

> Harris can show the Defendants worked together to arrest him, but he cannot show that this was an unlawful action – it is their specific job to arrest suspected criminals. Their actions were not illegal. The Plaintiff's proffered motive— that Robinson was included in a lawsuit brought by Harris some ten years earlier, has no traction. Thus, even if Harris may be able to show a conspiracy between Defendants, he cannot he cannot show the conspiracy was designed to injure him by unlawful action. Moreover, no unlawful activity, on behalf of these Defendants, occurred. Accordingly, this claim must be dismissed.

-37-

[Record No. 83-1 at 20]  This argument is insufficient for summary judgment purposes.

As an initial matter, construing all facts in the light most favorable to the plaintiff requires the Court to attribute at least some credence to the argument that Robinson had motive against Harris.  This alone is surely not enough.  Robinson testified that this was not even his case: "this one was William Goins' case that he worked on, but I was assisting."  [Record No. 85 at 27 (Robinson depo. at 104)]  Moreover, the record suggests that Goins was responsible for recruiting Little as a CI, and that it was Goins who enlisted her help in performing a controlled by on Harris.  Moreover, there is no direct evidence that Goins "shared in the general conspiratorial objective."  However, circumstantial evidence is enough.  Given the genuine issue of fact regrading whether probable cause existed to obtain an arrest warrant for Harris, there is a reasonable basis for a jury to find the elements of the conspiracy were met.  As one example, when asked if the video showed the controlled buy, Harris stated "I did not watch it, Detective Robinson did."  This is suggestive of Goins's reliance on Robinson.

Additionally, it must be noted that there is no evidence to support a jury finding that any of the defendants conspired with prosecutors to postpone Harris's trial.  Therefore, the conspiracy claim may go forward only as it related to the plaintiff's Fourth Amendment claim.

### g.    Unconstitutional Policies/Procedures

Count VII applies only to Clay County and the City of Manchester.  [*See* Record No. 1 at 22.]  Harris alleges that "Defendants Clay County and the City of Manchester, by and through their final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional behavior by their law enforcement officers and prosecutors."  [*Id.* at 22 ¶153]  Harris alleges that the harm he suffered was so obvious that "the Defendants can reasonably

-38-

be said to have been deliberately indifferent to the need," and that the "municipal Defendants possessed actual knowledge indicating that they knew or should have known that constitutional violations such as those alleged herein were likely to occur." [*Id.* at 23 ¶¶154, 155]  Harris contends that the municipalities' "policies, customs, patterns, practices, and/or failure to act directly resulted in Harris' malicious prosecution and wrongful incarceration." [*Id.* at 23 ¶157]

"A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 401-02 (6th Cir. 2016) (citing to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  "[T]he plaintiff must show 'a direct causal link' between the policy and the alleged constitutional violation such that the municipal policy can be deemed the 'moving force' behind the violation." *Id.* (quoting *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004)) (quotation marks omitted).  "A policy or custom cannot be established solely by a single instance of an employee's alleged misconduct."  *Id.* (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir.  2005)). Instead, Harris must show that the municipalities' and UNITE's policies were "representative of (1) a clear and persistent pattern of illegal activity, (2) which the [defendants] knew or should have known about, (3) yet remained deliberately indifferent about, and (4) that the [defendants'] custom[s] w[ere] the cause" of the deprivation of [his] constitutional rights." *Bickerstaff,* 830 F.3d at 402.

### 1.    Clay County

Harris seeks to hold Clay County responsible for the length of his incarceration under the theory that they "Failed to Institute Proper Customs, Policies, Practices, and/or Procedures to Ensure the Rights of Citizens Who Were Prosecuted and Incarcerated."  [Record No. 102 at

40]   This claim rests on the assertion that Clay County is itself responsible for customs/practices/policies and/or procedures of the Clay County Circuit Court and the Commonwealth's Attorney in the 41st Judicial District.   Harris alleges that law enforcement and others "exploited the existing systemic weaknesses of their own employers and *the Clay County criminal justice system.*" *Id.* (emphasis added).

The Commonwealth's Attorney's Office and Clay County Circuit Court are not managed or controlled by Clay County, contrary to Harris's assertions.   They are distinct entities under state law.   [*See* Record No. 107 at 1-2 (citing KRS 15.700, *et seq.*; KRS Chapter 27).]   The 41st Judicial District includes Clay, Jackson, Leslie counties.[21]   There is no testimony in the record establishing in any way that the county has control over the actions of the prosecutor or the circuit court.   For example, the trial schedule for each judicial district is set by the Chief Justice of the Kentucky Supreme Court, as made clear in previous testimony.   [*See* Record No. 61 at 7.]   Therefore, the plaintiff's allegation that Clay County should be held liable for the policies, or lack of policies, regarding felony prosecutions in that county cannot stand.   *Cf. Mann v. Helmig*, 289 F. App'x 845, 851 (6th Cir. 2008) ("Certainly, there is no basis in this record for concluding that the Commonwealth Attorney creates policy for Boone County, the only defendant in this case.").   This is the sole theory of liability asserted by Harris in his response to Clay County's summary judgment motion.   Because there is no genuine

---

[21] *See* Deposition of Gary Gregory, Record No. 47 at 2.  *See also* http://courts.ky.gov/resources/publicationsresources/Publications/P108KYJudicialDistrictsMap85x11_211web.pdf; http://courts.ky.gov/Local_Rules_of_Practice/C41LOCALRULES.pdf

issue of material fact regarding its liability for the wrongs alleged, summary judgment will be entered in favor of Clay County as to all counts.

### 2.    City of Manchester

According to the City of Manchester,

> Harris cannot establish that MPD, UNITE, or the City['s] polices are representative of a pattern of illegal activity.  There are no facts in the record showing other illegal acts to show a pattern with regard to Harris or in other investigations.  Nor is there evidence these Defendants were aware of any persistent constitutional violations and then turned a blind eye to the problems.

[Record No. 83-1 at 21-22]  This argument is compelling because, as stated, "[a] policy or custom cannot be established solely by a single instance of an employee's alleged misconduct." *Bickerstaff*, 830 F.3d at 402 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir.  2005)).   Harris, however, responds that,

> [w]hile a pattern of violations is generally required to establish municipal liability, in *Connick* [*v. Thompson*, 563 U.S. 51, 64 (2011)], the Court explained that [*City of Canton v. Harris*, 489 U.S. 378 (1989)] did not "foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  Here, the City of Manchester's failure to train and properly supervise its officers, and Clay County's failure to properly train and supervise officials responsible for prosecution and incarceration, resulted in the malicious prosecution and unnecessarily prolonged detention of the Plaintiff, as explored further in the sections below.

The ellipses in Harris's argument excludes the words "however rare," referring to the likelihood of a "single-incident liability." *Connick*, 563 U.S. at 64.  *Connick* held, for example, that "[f]ailure to train prosecutors in their *Brady* obligations does not fall within the narrow range of *Canton's* hypothesized single-incident liability."  *Id.*

*Harris* makes no compelling argument that single-incident liability should attach.  His strongest argument is that "Manchester failed to establish a protocol for drivers or other third

-41-

parties who might participate in controlled buys." [Record No. 102 at 40]  He speculates that "[a]pparently, under Manchester's policies, anyone in the world may participate in a controlled buy - a drug dealer, a multiple convicted felon, someone with a personal vendetta against a target, anyone - as long as that person is not specifically designated a "confidential informant." [*Id.* at 40-41]

However, Harris's basis for this statement is unclear.  He quotes Chief Fultz's deposition answer responding "No" to the question: "Is there any written orders that the City of Manchester has specifically relating to confidential informants?"  [Record No. 102 at 40 (citing Record No. 90 at 16 (Fultz depo. at 59))]   But the record shows that Manchester *does* have a policy on use of confidential informants in drug investigations.  [*See* Record No. 90 at 4 (Fultz depo. at 13); Record No. 90-2 at 9-11]  Moreover, Chief Fultz testified that there are only 12 officers, most of whom have a background in narcotics investigations, and that if there were a new officer who had never performed an investigation "there would be somebody with them to oversee the investigation."  [*Id.* at 5 (Fultz depo. at 16)]

In short, Harris has fallen well short of alleging "a clear and persistent pattern of illegal activity."  *Bickerstaff*, 830 F.3d at 402.  Moreover, he has not shown that the situation here warrants a "hypothesized single-incident liability."  *Connick*, 563 U.S. at 64.  Accordingly, judgment will be entered in favor of the City of Manchester on Count VII.[22]

### h.    Malicious Prosecution under Kentucky Law

As the Kentucky Supreme Court articulated in *Martin v. O'Daniel*, 507 S.W.3d 1 (Ky. 2016), as corrected (Sept. 22, 2016),

---

[22]    Again, no liability can attach to the City regarding the alleged violation of Harris's Sixth Amendment right.

> [a] malicious prosecution action may be established by showing that:  1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff; 2) the defendant acted without probable cause; 3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based; 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and 5) the plaintiff suffered damages as a result of the proceeding.

507 S.W.3d at 11-12.  The element distinguishing the state law claim from the federal claim is malice.  *See Sykes v. Anderson*, 625 F.3d 294, 309 (6th Cir. 2010) ("This circuit has never required that a plaintiff demonstrate 'malice' in order to prevail on a Fourth Amendment claim for malicious prosecution, and we join the Fourth Circuit in declining to impose that requirement.").  Nonetheless, "[u]nder Kentucky law, 'malice can be inferred from a lack of probable cause.'" *Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 665 (W.D. Ky. 2013) (quoting *Massey v. McKinley*, 690 S.W.2d 131, 134 (Ky.1985)).  Accordingly, because there is a sufficient factual dispute to permit the federal claim to go forward, the state malicious prosecution claim may also proceed.[23]

### i.    Intentional, Reckless, Negligent Infliction of Emotional Distress

Harris alleges in Count VIII that "[d]efendants intentionally, recklessly, and/or negligently directly and proximately caused Harris to be falsely arrested, maliciously prosecuted, and wrongfully incarcerated, and artificially and deliberately prolonged his pretrial detention."  [Record No. 1 at 23 ¶159]  Moreover, "[d]efendants' actions caused Harris to

---

[23]    While Kentucky law provides qualified immunity for law enforcement officers acting in good faith, *see Martin*, 507 S.W.3d at 5 (Ky. 2016) (citing *Yanero v. Davis*, 65 S.W.3d 510 (Ky.2001)), defendants cite only federal immunity caselaw, which is not applicable to state claims.  In any event, because there is at least a genuine issue of material fact as to the defendants' intent, an assertion of qualified immunity would not merit summary judgment.

suffer physical harm, including physical ailments and unauthorized physical contact resulting from the circumstances and duration of his wrongful incarceration, and to fear for his physical safety throughout the period of his incarceration." [*Id.* at 23 ¶160]  Finally, Harris argues that the "[d]efendants' actions caused [him] to experience severe emotional distress" and that the defendants' conduct "is beyond the bounds of any standard of decency, so as to be utterly intolerable in a civilized society." [*Id.* at 24 ¶161-62]  Harris pleads "outrage" and negligent infliction of emotional distress.

As an initial matter, because the statute of limitations has run on a claim for false arrest, Count VIII cannot proceed inasmuch as it relies on that theory.  *See Dunn v. Felty,* 226 S.W.3d 68, 70 (Ky. 2007) (one year statute of limitations for false arrest) (citing KRS 413.140(1)(a),(c));  *Id.* at 72-73 (claim for false arrest accrues at arraignment and tolling rules do not apply).  Moreover, because there is no competent record evidence that the defendants are responsible for Harris's prolonged incarceration, this Count cannot proceed on that theory either.  What is left is malicious prosecution.

The tort of outrage is permissible where the defendants "solely intended to cause extreme emotional distress."  *Green v. Floyd County*, 803 F. Supp. 2d 652, 655 (E.D. Ky. 2011) (citing *Brewer v. Hillard*, 15 S.W.3d 1, 7-8 (Ky. Ct. App. 1999)).  "When the claim of emotional distress is a supplement to another tort claim, such as false imprisonment, the burden of showing sole intent cannot be met."  *Lovins v. Hurt*, Civil Action No. 11-216-JBC, 2011 WL 5592771, at *3 (E.D. Ky. Nov. 16, 2011) (citing *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993)).  The traditional tort of malicious prosecution is available to Harris, and it allows recovery for emotional distress damages.  *See Carter v. Porter*, 617 F. Supp. 2d 514, 520 (E.D. Ky. 2008) (citing *McCoy v. RWT, Inc.*, Nos. 2003-CA-

002177-MR, 2003-CA-002241-MR, 2005 WL 1593651, at *5 (Ky. Ct. App. July 8, 2005), rev'd on other grounds, 244 S.W.3d 44 (Ky. 2008)).  Because Harris does not allege that the defendants "solely intended to cause extreme emotional distress," his IIED/outrage claim cannot proceed.  *See Green*, 803 F. Supp. 2d at 655; *see also Vidal v. Lexington Fayette Urban County Gov't*, Civil Action No. 5: 13-117-DCR, 2014 WL 4418113, *9 (E.D. Ky. Sept. 8, 2014).  Indeed, Harris alleges that the defendants intended to cause his wrongful arrest, prosecution and imprisonment, well beyond simply emotional distress.

Likewise, a "plaintiff cannot proceed with a claim for negligence where the claim is really a malicious prosecution claim."  *Tunne v. Paducah Police Dep't*, No. 5:08CV-188-R, 2010 WL 323547, *11 n.4 (W.D. Ky. Jan. 21, 2010) (citing *Hill v. Willmott*, 561 S.W.2d 331, 334 (Ky. Ct. App. 1978)).

> The policy considerations addressed by the elements of a malicious prosecution action would be thwarted if the plaintiff were allowed to proceed on a theory of negligence.  The plaintiff may not avoid the higher standards of malicious-prosecution claims by bringing negligence claims against the defendants under the same facts that constitute his other claims.

*Bertram v. Federal Express Corp.*, No. CIV.A. 05-28-C, 2008 WL 170063, at *7 (W.D. Ky. Jan. 17, 2008) (citing *Hill*, 561 S.W.2d at 334).  The policy rationale is straightforward, allowing simple negligence claims against police for such conduct my unreasonably inhibit their work for fear of reprisal.  *See id.* at n.7 (discussing the policy rationale in *Hill.*)  Accordingly, judgment will be entered in favor of the defendants as to Count VIII.

### j.    Negligence, Gross Negligence, Recklessness

Harris alleges in Count X that "the individual Defendants named herein, and UNITE, owed a duty to Harris as imposed by Kentucky common law and as described above," and that they breached their duty "by acting with negligence, gross negligence, and/or recklessness in

allowing him to be incarcerated, and for prolonging his incarceration, for crimes they knew or should have known he did not commit." [Record No. 1 at 25 ¶¶ 170-71] Moreover, the defendants "breached their duty to Harris by not acting in some manner to prevent [Harris's] continued detention," and "[a]s a result of Defendants' negligent/grossly negligent/reckless breach of their respective duties, Harris was egregiously harmed." [*Id.* at 25 ¶¶ 172-72]

As discussed above, this claim may proceed only inasmuch as it rests on a theory of malicious prosecution and, therefore, only with regards to gross negligence and recklessness.

### k.    Civil Conspiracy under Kentucky Law

"[T]o prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) (citing *Montgomery v. Milam*, 910 S.W.2d 237, 239 (Ky. 1995)). "[T]he elements of a civil conspiracy are: 1) an agreement or combination, 2) that is unlawful or corrupt, 3) entered into by two or more persons, 4) for the purpose of accomplishing an unlawful goal." *Ellington v. Fed. Home Loan Mortg. Corp.*, 13 F. Supp. 3d 723, 730 (W. D. Ky. 2014) (quoting *Brown v. Student Loan Xpress, Inc.*, 2012 WL 1029467, *10 (W. D. Ky. March 26, 2012)). "Civil conspiracy is not a free-standing claim; rather, it merely provides a theory under which a plaintiff may recover from multiple defendants for an underlying tort." *Id.* (quoting *Flint v. Coach House, Inc.*, 2013 WL 869649, *4 (Ky. Ct. App. March 8, 2013)). "The law in Kentucky requires the actual commission of the tortious act or a concert of action where substantial assistance has been provided [] for liability to attach based on a civil conspiracy theory." *James v. Wilson*, 95 S.W.3d 875, 897-98 (Ky. Ct. App. 2002).

The Complaint alleges the elements of civil conspiracy, stating the defendant-officers "acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means." [Record No. 1 at 24 ¶164] The Complaint alleges overt acts "including but not limited to the malicious prosecution of Harris and the intentional infliction of emotional distress upon him." [*Id.* at 24 ¶165]

The defendants do not make any freestanding arguments as to the state civil conspiracy cause of action. Rather, the summary judgment motion appears to subsume Count IX into the discussion of Count VI. The evidence of the unlawful agreement is, of course, the same as above. And because there is a sufficient basis for the jury to find in the plaintiff's favor on the state-law tort claims (with the exception of "artificially and deliberately prolong[ing] [Harris's] pretrial detention," for which there is insufficient evidence), the state law conspiracy claim may proceed.

## IV.

Defendant George Stewart will be dismissed as a party and summary judgment will be granted in favor of Clay County on all Counts. Next, summary judgment will be granted in favor of Defendant Goins, et al., on Count II (Due Process), Count IV (Violations of Sixth Amendment) and Count VII (*Monell* Liability), and on the remaining Counts inasmuch as they are based on alleged Sixth Amendment violations. Summary judgment also will be entered in favor of Defendant Goins, et al., on Count VIII (Emotional Distress), the outrage and negligence theories contained in Count IX (Civil Conspiracy), the negligence theories contained in Count X (Negligence/Gross Negligence/Recklessness), and the false arrest and/or prolonged incarceration theories contained in Counts IX and X. Accordingly, it is hereby

**ORDERD** as follows:

-47-

1.      Defendant Clay County, Kentucky's Motion for Summary Judgment [Record No. 82] is **GRANTED**.  Plaintiff Alberto Harris's claims against Defendant Clay County, Kentucky are **DISMISSED**, with prejudice, in their entirety.

2.      Plaintiff Alberto Harris's claims against Defendant George Stewart in his individual capacity are **DISMISSED**, with prejudice, in their entirety.

3.      Defendants William Goins, Patrick Robinson, Unlawful Narcotics Investigation Treatment and Education, Inc. (UNITE) and the City of Manchester, Kentucky's Motion for Summary Judgment [Record No. 83] is **GRANTED**, in part, and **DENIED**, in part, consistent with this Memorandum Opinion and Order.

a.      Summary Judgment is **GRANTED** in favor of these defendants on Count II (Due Process), Count IV (Violations of Sixth Amendment) and Count VII (*Monell* Liability).

b.      Summary Judgment is **GRANTED** in favor of these defendants on all theories relating to the Sixth Amendment speedy trial/prolonged incarceration issues otherwise pleaded in the Complaint.

c.      Summary Judgment is **GRANTED** in favor of these defendants on Count VIII (Emotional Distress).

d.      Summary Judgment is **GRANTED** in favor of these defendants on Count IX (Civil Conspiracy) with respect to theories of outrage and negligence, and theories based on false arrest and/or prolonged incarceration.

e.      Summary Judgment is **GRANTED** in favor of these defendants on Count X (Negligence/Gross Negligence/Recklessness) with respect to the theory of negligence and theories based on false arrest and/or prolonged incarceration.

-48-

    f.  Summary Judgment is **DENIED** with respect to all remaining counts and theories.

    4.  Defendant Clay County, Kentucky's Motion to Join [Record No. 134] is **DENIED** as moot.

    5.  A revised Scheduling Order will be entered separately.

    This 20th day of July, 2017.



Signed By:

**_Danny C. Reeves_**

**United States District Judge**